HERMA R. MITCHELL, Respondent, v. CARRIE L. MITCHELL et al., Appellants; PRUDENTIAL INSURANCE COMPANY OF AMERICA, Appellant and Respondent; CARRIE L. MITCHELL, as Executrix of STEELE MITCHELL, Deceased, Respondent, Impleaded with Others.*

First Department, October 30, 1942.

* Revg. 177 Misc. Rep. 1050.

*Arthur L. Burchell* for appellants.

*Merwin F. LeVine, Solon Weit* and *Joseph G. Telchin* for defendant, appellant-respondent.

*Stanley Ide LaCov* and *John M. Percy* for plaintiff-respondent.

*Chester Bordeau* for defendant-respondent.

*Albert Hirst* for New York State Association of Life Underwriters, *amicus curiae*.

GLENNON, J.   The plaintiff is the widow of one Steele Mitchell who died on December 2, 1940.   Prior to his death, the deceased, who was president of a large corporation, lived with plaintiff in an apartment at 1010 Fifth avenue, county and city of New York.   The defendants, Carrie L. Mitchell, Lucy R. Brown and James S. Brown, are the mother, sister and nephew, respectively, of the deceased and are beneficiaries named in certain life insurance policies issued to the deceased.   The defendant, Hazel M. Wood, for a number of years before the death of Mr. Mitchell, was his private secretary, and she also was named as a beneficiary.   The insurance companies named as defendants wrote the policies, which are the subject of this action, on the life of the deceased.

The action was instituted by plaintiff to set aside transfers of property, real and personal, and changes of beneficiaries of such life insurance policies, upon the ground that they were illusory, fraudulent and void as against her and the deceased's estate.

Since the court at Special Term has found that the transfers by the deceased of his real and personal property were not fraudulent, and in addition thereto that "The change of bene-

ficiary in favor of defendant, Hazel M. Wood, in Travelers Insurance Policy #889887 was made by Steele Mitchell in good faith and for the purpose of having her receive the payment due under said policy upon said Steele Mitchell's death'', and plaintiff has not appealed from the judgment entered thereon, those questions must be deemed settled by the judgment as entered.

Thus it will be seen that the only questions involved herein are whether or not the changes of beneficiaries in the remaining insurance policies constitute illusory transfers, and if not, whether the judgment should be sustained on the ground of the fraud alleged to have been practiced by the deceased on the plaintiff.

We are inclined to the view that the court at Special Term should not have sustained plaintiff's contentions on either ground. At the outset, it might be well to point out that the Legislature in enacting section 18 of the Decedent Estate Law (Cons. Laws, ch. 13) had in mind a restraint only on testamentary powers. It did not refer in any way to non-testamentary powers.

In so far as the first cause of action is concerned, it may be enlightening to set forth the history of the policies in suit. The record shows that the deceased's father died in 1906 when the deceased was nine years of age. Needless to say, he looked to his mother for support. When he was twenty-seven years of age on July 12, 1924, the first of the policies here involved was issued by the Travelers Insurance Company. This policy was in the face amount of $5,000 and was made payable to Carrie L. Mitchell, the mother of the deceased. Later on October 30, 1935, he elected to change the beneficiary to Commercial National Bank and Trust Company of New York as trustee under a trust agreement for the benefit of his mother. More than three years after his marriage to plaintiff, on March 8, 1940, the deceased again changed the beneficiary, at that time naming his estate. Finally, on September 26, 1940, he made another change wherein his mother was again named as the beneficiary. After the death of the insured, the company paid Carrie L. Mitchell, the mother, $4,132.95, representing the balance of the proceeds of the policy after deducting an outstanding loan.

The remaining five policies were issued by the Prudential Insurance Company of America. Each was in the sum of $10,000 and all were dated June 29, 1927. In each of these policies Carrie L. Mitchell was named as beneficiary. On November 4, 1935, the beneficiary of each of these policies was changed to Commercial National Bank and Trust Company of

New York as trustee. Two years later, on December 8, 1937, the plaintiff was named beneficiary of one of the policies. On March 11, 1940, deceased changed the beneficiaries of the remaining four policies from the trustee to his estate. Finally, on July 19, 1940, when his mother was about seventy-three years of age, the deceased changed the beneficiaries of these five policies and adopted option No. 3 as the mode of settlement. Option No. 3 provided for the proceeds of the policies to be held by the insurance company at three and one-half per centum interest. The income therefrom was to be paid to Carrie L. Mitchell for life. She was also given the right to withdraw up to $3,000 a year of the principal. Upon her death the balance was to be held under the same terms for the benefit of the deceased's sister, Lucy R. Brown, with the remainder, if any, over to her son, James S. Brown. After the death of the deceased, defendant Prudential Insurance Company of America, in accordance with the provisions of the policies, issued its settlement certificate to Carrie L. Mitchell. The proceeds of the five policies amounted to $44,527.02 after the deduction of outstanding loans.

In making the various changes in beneficiaries, the deceased exercised his absolute right so to do. There was nothing illusory about any of the changes. His contracts of insurance gave him that right. Under the circumstances, the first cause of action should have been dismissed on the merits.

We now come to the second question which has to do with the charge of fraud as outlined in the second cause of action. In order to point out the reason why the judgment should not be upheld upon that ground, it is necessary to review the testimony, at least in part, which is to be found in the record.

Plaintiff and the deceased were married on November 25, 1936. At the time of the marriage, plaintiff had no private assets, property or fortune, as she testified, "to amount to anything." While we have not the benefit of the deceased's testimony, since his lips were sealed in death, we have the admissions in the record from the plaintiff that he was exceedingly generous in providing for her. He supplied her with "plenty" of spending money. In fact, she stated that he paid all of her bills at the fashionable shops, spending $4,000 annually on her clothes, and that he gave her $250 to $300 a month for what she referred to as "pin money". During this period of time, his salary as president of the corporation was about $36,000 a year, and he had additional income which brought his annual earnings up to approximately $40,000. According to the plaintiff, the deceased did not have much property, "only the money he made." The

rental of the apartment was $3,400 a year. There were nine rooms and four household servants.

Apparently there came a time when the deceased sought to cut down the household expenses. Whether or not he was tax conscious during that period, the record does not show. Eventually, on June 15, 1940, the deceased left his home. On July twenty-second of that year he wrote to the plaintiff complaining of the excessive expense of maintaining the apartment on Fifth avenue and suggested, in effect, that it should be reduced. The plaintiff said that she did not think it was a reasonable request. In answer to a question by the court: "You mean at the time it was written?" she testified: "No, not at that time. We had been living in that apartment all along. I didn't see any reason why it should suddenly become so expensive just at that point."

Plaintiff, on September 24, 1940, commenced an action for a separation. On that very day, the deceased made and executed his last will and testament wherein he bequeathed to plaintiff the sum of $15,000. On September twenty-fifth, according to plaintiff, the parties met at their home and the following conversation ensued: "Mr. Mitchell and myself conversed on that evening —he came to me and asked me to forgive him, said he had made a big mistake, that he was worried over business matters, and a lot of other things; and that he thought he treated me very badly— Mr. Asch: I object to all this and move to strike it out. The Court: This is all taken subject to a motion to strike it out, as I have said. The Witness: And I told him that I had always wanted a reconciliation, that I thought we could make a success of the marriage; and I told him that I had talked to my attorney in the afternoon and he was perfectly willing to have a reconciliation, but I would have to use my own judgment as to whether I thought he was being honest, that he did not think he was, that he thought he probably planned to strip himself of all his property and prevent me from getting what I was lawfully entitled to; and Mr. Mitchell said, well, that he was certainly honest. He said, 'I have known him for a long time, he has always been honest.' I said then that I thought he was; and he said that all of his property, in case of his death, had always been fixed in such a way that all his insurance and all his property was to be equally divided between his mother and myself, as we were the only two people that he had any interest in; that it had always been that way, and it had never been changed, and always would be that way, and I believed him, he had always been honest with me."

This conversation is relied upon by plaintiff to sustain her contention that the deceased was guilty of false and fraudulent representations, and her reliance thereon, with reference to the division of his property and insurance. One might reach the conclusion, if no further testimony had been developed, that plaintiff did rely upon the so-called representations of the deceased were it not for the following testimony which she gave upon cross-examination: "Q. And you had written him a number of letters asking him to come back, hadn't you? A. Yes. Q. And you really begged and pleaded with him to come back? A. I did. Q. Didn't you tell him in one of these letters that he could come back on his own terms? A. I did. Q. You really loved him, didn't you? A. I did. Q. Did you become reconciled with him and go back with him because you loved him? A. That is the only reason. Q. That is the only reason? A. Yes. Q. Really the insurance had nothing to do with it? A. No. Q. You would have gone back and lived with him regardless of any statement made about the insurance or other property, wouldn't you? A. Well, I would not have gone back to him knowing that he was being dishonest with me."

Since, according to her admissions, the insurance had nothing to do with the reconciliation of the parties, it is difficult to understand in what manner the plaintiff was actually defrauded by her deceased husband. Perhaps it would not be amiss to quote from the case of *Ward* v. *N. Y. Life Ins. Co.* (225 N.Y. 314) wherein Chief Judge HISCOCK said in part: "The rule in any civil case is that the plaintiff must establish his claim by a fair preponderance of evidence. He need do no more than this if his claim deals with a dead person; he cannot do less if he is attacking the rights and property of a living person. The general rule as to weight and quality of evidence is no different in one case than in the other. In applying the rule and test to specific evidence, however, it very likely will and should occur that the triers of fact will more carefully and critically scrutinize evidence offered against a dead person's estate for the purpose of deciding whether it does make the necessary weight and preponderance of evidence, than would be done if the testimony was offered against one who was alive to contradict it."

That the deceased was in need of funds at the time of the reconciliation is evidenced by the fact that on September twenty-sixth he borrowed from the insurance companies $7,800.10 upon the policies affected by the judgment herein which was the full amount available for loan purposes. Furthermore, at the time of the reconciliation the deceased had three additional policies

which totaled the sum of $60,000 and were payable to his estate. Two of these policies which were for a total sum of $10,000 were still in effect at the time of his death but were not paid because of a one year suicide clause. The other policy in the sum of $50,000 was in arrears for non-payment of premiums due as of September 5, 1940, and was cancelled at the conclusion of the thirty day grace period.

As far as the record shows, the plaintiff and the deceased continued to live in their apartment on Fifth avenue until December 2, 1940. On the morning of that day, the deceased gave plaintiff a sealed envelope containing about $7,000 in cash to compensate her for certain securities which were originally given to her by him and which she had turned over to him. Later on that day the deceased died as the result of a "bullet wound of the skull and brain." According to the certificate of the department of health of the city of New York, the death was "suicidal."

Incidentally, before concluding, attention should be directed to the fact that the net amount of the deceased's estate, according to the record, was $11,928.74 at the time of trial, which was subject to attorney's fees and taxes.

The judgment in so far as appealed from should be reversed with costs, and the complaint dismissed with costs.

MARTIN, P. J., TOWNLEY, UNTERMYER and DORE, JJ., concur.

Judgment, so far as appealed from, unanimously reversed with costs and the complaint dismissed with costs. Settle order on notice, reversing findings inconsistent with this determination, and containing such new findings of fact proved upon the trial as are necessary to sustain the judgment hereby awarded.